Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER IRWIN,          :
         Plaintiff          :
                            :
    v.                      : C.A. No. 02-246 Erie
                            :
NURSE 1, NURSE 2, NURSE 3,  :
WARDEN, WASHINGTON COUNTY   :
CORRECTIONAL FACILITY,      :
PATROLMAN RON RAYMOND,      :
CHARTIERS TOWNSHIP POLICE   :
DEPARTMENT,                 :
         Defendant          :

Deposition of CHRISTOPHER IRWIN, taken before and by Janis L. Ferguson, Notary Public in and for the Commonwealth of Pennsylvania, on Monday, June 12, 2006, commencing at 10:56 a.m., at the SCI Albion, 10745 Route 18, Albion, Pennsylvania 16475.

For the Defendants:
    Edmond R. Joyal, Jr., Esquire
    Law Office of Joseph S. Weimer
    975 Two Chatham Center
    Pittsburgh, PA 15219

Reported by Janis L. Ferguson, RPR
Ferguson & Holdnack Reporting, Inc.

Page 2

INDEX

TESTIMONY OF CHRISTOPHER IRWIN
    Direct examination by Mr. Joyal ........ 3

Page 3

1  CHRISTOPHER D. IRWIN, first
2  having been duly sworn, testified as follows:
3
4            DIRECT EXAMINATION
5  BY MR. JOYAL:
6
7  Q.  State your full name, please.
8  A.  Christopher Dale Irwin.
9  Q.  Dale?
10 A.  Yeah.
11 Q.  And you're now at SCI Albion?
12 A.  Yes.
13 Q.  What are you here for?
14 A.  For the deposition for --
15 Q.  Well, okay. I understand, yeah. You're here
16 today for a deposition. What have you been sentenced to, to
17 be here --
18 A.  Oh, what am I here for?
19 Q.  Yeah.
20 A.  I'm here for vehicular homicide.
21 Q.  And do you have a parole date or a release date?
22 A.  About middle of April, 2007.
23 Q.  April of 2007 will be your minimum?
24 A.  Yeah. My maximum is probably April of 2011.
25 Q.  Okay. And where did this accident, incident take

Page 4

1  place?
2  A.  Washington County.
3  Q.  Is this the automobile accident that you were
4  involved in when you were brought to the Washington County
5  Correctional Institute?
6  A.  Yes.
7  Q.  In 2002?
8  A.  Yes.
9  Q.  This was July. Is that correct?
10 A.  What's that?
11 Q.  July of 2002?
12 A.  Yes.
13 Q.  Okay. Had you ever been in the Washington County
14 Correctional Facility before this incident?
15 A.  Yes.
16 Q.  How many times?
17 A.  Be like two or three. Just for like little short
18 things. I was in there for like a day or two a couple
19 times, and I was in there for like 37 days once. That's the
20 most time I ever done before this.
21 Q.  Okay. And what were those things for? Well,
22 let's do the 37-day one.
23 A.  That was for, I think, probation or something.
24 Q.  Probation violation?
25 A.  Yeah.

Page 5

1  Q. What year was that? Do you know?
2  A. I don't know.
3  Q. Late 90's?
4  A. Let me try to think. Probably late 90's. Maybe
5  2000. I ain't sure.
6  Q. All right. And had you been in any other county
7  correctional facilities?
8  A. Before?
9  Q. Besides -- before. Before 2002.
10 A. Like --
11 Q. Like Greene County, like Allegheny County? You
12 did some earlier time in Washington County, correct?
13 A. I was in the Allegheny County for a day and a
14 half, but that was --
15 Q. Well, that was at the same time in jail, right?
16 A. Yes. I was in a county in Florida in jail.
17 Q. When were you in jail in Florida?
18 A. Let me think for a minute. Maybe around '93 or '4
19 for nine days.
20 Q. How old were you then?
21 A. Around 21.
22 Q. How old are you now?
23 A. 33.
24 Q. When you were in -- tell me when you were
25 processed in the first time that -- the time that you were

Page 6

1  in Washington County for that 37-day thing. Tell me, if you
2  could, what you were told. I mean, were you given like a
3  handbook or a book of things that inmates have rights to do?
4  A. They don't -- they don't give them to you in that
5  jail.
6  Q. Did you ever see the -- they told you about the
7  inmate grievance procedures?
8  A. No. They -- that jail, with the inmate grievance
9  procedures, it's -- it's ridiculous. Now -- now you -- they
10 won't even give you a grievance to file.
11 Q. Really? So what you're telling me is that you
12 never saw any of the stuff about religious services,
13 educational programs, inmate grievance procedures, things
14 like that?
15 A. At one time -- I mean, which time? I mean, at one
16 time --
17 Q. Well, let's go back. I'm asking you the time that
18 you said you were in there for the 37 days. Had you been
19 told about grievance procedures?
20 A. I don't believe I was specifically ever told about
21 grievance procedures. But -- but one -- I can't know for
22 sure if it was that 37 days. One time -- they did have rule
23 books at one time, maybe. And maybe they -- I may have seen
24 that video that they supposedly played one time.
25 Q. You may have seen it?

Page 7

1  A. Yeah. Parts of it.
2  Q. Well, how do you know that there was even a video,
3  if you didn't see it?
4  A. Because they are supposed to play it for you.
5  Everybody talks about it. But they don't play it for nobody
6  no more.
7  Q. Well, you haven't been in there since when?
8  A. I haven't what?
9  Q. You haven't been in Washington County since when?
10 A. I was in Washington County a few months ago.
11 Q. For what?
12 A. They give -- they give no rule books, play no
13 video.
14 Q. What were you in Washington County for?
15 A. A hearing for my parental rights.
16 Q. Oh, I see. So they brought you down for what, a
17 day?
18 A. A week.
19 Q. You were there for a week because you haven't --
20 there was someone -- was OCY trying to terminate your
21 parental rights?
22 A. CYS.
23 Q. CYS was trying to terminate your parental rights?
24 A. Yes.
25 Q. Were they also trying to terminate the mother's

Page 8

1  parental rights at the same time?
2  A. The mother voluntarily terminated hers.
3  Q. So --
4  A. I mean, I was down there for then. They don't --
5  they wouldn't give me my meds, nothing from up here. They
6  just --
7  Q. Okay. Well, you --
8  A. It's ridiculous.
9  Q. What are you on medication for now?
10 A. I'm on a medication for ADD. I was -- Flexeril
11 for my back and neck. And I was taking something else for
12 my -- I don't remember what the name of it was.
13 Q. While you were here?
14 A. Yeah.
15 Q. And how did you get your medications here?
16 A. Seen a doctor.
17 Q. And the doctor from this institution prescribed
18 your medication for you?
19 A. Yeah. I was -- I was also seeing a physical
20 therapist lady here.
21 Q. Here, okay. So you were being given medications
22 as a result of being prescribed them by a physician up here
23 at the institution. Is that right?
24 A. Yeah.
25 Q. And you were not prescribed any medications by any

Page 9

1 medical staff person down in Washington County when you were
2 there in 2002. Is that right?
3    A. I was prescribed -- they kept switching -- they
4 was giving me like stuff to -- couldn't even barely help a
5 headache. They were trying to give me Aleve at one time or
6 Motrin.
7    Q. That wasn't my question. Listen to what my
8 question was. My question was, did anyone on the medical
9 staff in Washington County ever prescribe you any narcotic
10 medication?
11    A. No. No. No narcotics.
12    Q. And you had seen doctors and nurses just about
13 every day when you were there?
14    A. I seen them a good bit there, yeah.
15    Q. I mean, you'd request to see them. Sometimes you
16 requested two or three times a day at least, right?
17    A. I requested -- at the beginning, I requested a lot
18 of time. I couldn't -- because I couldn't move. I was -- I
19 couldn't move my neck and my back.
20    Q. You would agree with me that from the time you
21 went in there until the time you went out of Washington
22 County, you saw a nurse at least once a day and sometimes
23 even up to four times.
24    A. I can't see -- well -- I mean, I seen the nurses
25 every day, because they come to the block.

Page 10

1    Q. Right. And you'd talk to them. Right?
2    A. Not every day. Because I get mad. I get mad,
3 because they wouldn't do nothing to help me.
4    Q. At any time when you were in Washington County,
5 when you requested to see a nurse or to go on sick call, did
6 anyone ever refuse you the right to do that?
7    A. I can't say. I don't know for sure either way.
8    Q. Okay.
9    A. I know that -- I know that after I kept requesting
10 so many times, they just really didn't want to do nothing
11 for me; even look at me.
12    Q. Okay. Have you ever seen your records from
13 Washington County?
14    A. No.
15    Q. When you get medications here, are the costs of
16 the medications deducted from your --
17    A. No.
18    Q. -- commissary account?
19    A. No.
20    Q. No?
21    A. If -- the only way that they would deduct anything
22 is if you went to see -- if you went to see the -- see, like
23 me, I would go see him somewhat regular for my back and
24 that, and I wouldn't never have to pay for nothing, because
25 it's ongoing.

Page 11

1    Q. Right.
2    A. But if I had to come up here for something
3 different, there's a chance that they would make me pay a $4
4 fee for some new type of medication that didn't have nothing
5 to do with my ongoing problem.
6    Q. You know what Elavil is?
7    A. I don't know what it's -- Elavil?
8    Q. Elavil.
9    A. Or Aleve?
10    Q. Elavil, E-L-A-V-I-L.
11    A. Elavil. That's -- the psych. up here tries to
12 give people Elavil, from what I know.
13    Q. Sometime in July you asked to see a psychiatrist
14 or a psychologist, right? July 16th?
15    A. That's in Washington County?
16    Q. Yeah.
17    A. Somewhere along the line I did.
18    Q. And they saw you? Is that right?
19    A. I can't remember for sure.
20    Q. You don't remember?
21    A. I mean, I did see -- I mean, I've seen a lady --
22 I've seen a lady once or twice there at -- but I ain't so
23 sure what time. What -- you know, I can't put a time and
24 date on it.
25    Q. You can't? All right. Well, if I tell you that

Page 12

1 it was July 16th of 2002 that you saw Cathy Young, who is
2 from the mental health staff for Washington County, would
3 you have any reason to disagree with me?
4    A. I seen -- what day? July?
5    Q. July 16th of 2002.
6    A. I would say that I ain't for sure, but if that's
7 the day I seen the lady -- that they had me in the
8 Washington County Jail in the green room, they call it, they
9 had me down there, and I asked to see the psychiatrist so I
10 could get out of there. I mean, that room is ridiculous
11 they put you in.
12    Q. All right. Well, the question was, you told them
13 that you were under a lot of stress and you didn't know if
14 you could take it, right? And you wanted more medication?
15    A. What, the psychiatrist?
16    Q. Yeah.
17    A. I don't know. I was under stress.
18    Q. Okay. Did you ever talk about -- you had a drug
19 addiction history, right? Prescription drugs?
20    A. No.
21    Q. No? Do you know what -- what would you have -- if
22 you said to someone, I need nerve medication, what did that
23 mean to you?
24    A. If I said I need something for my nerves?
25    Q. Yeah. If you said, I need nerve medication,

3 (Pages 9 to 12)

Page 13

1 something for your nerves, what would you be looking for?
2     A.  Something for your nerves, to help your anxiety
3 and that.
4     Q.  Okay.  So do you know what Zoloft is?
5     A.  Zoloft?
6     Q.  Yeah.  Do you know what Zoloft is?
7     A.  I don't know -- I don't know exactly what it is.
8 I know what it is.
9     Q.  Do you know whether or not it's a drug used to
10 treat psychiatric problems?
11    A.  Yeah, I know that.  My grandma is taking it.
12    Q.  Do you know what Librium -- and you were taking
13 it, right?
14    A.  Somewhat, yeah.  It doesn't -- it ain't --
15 doesn't -- ain't good for nothing.  Like a guinea pig.  Keep
16 trying to give you different things.
17    Q.  Do you know what Librium is?
18    A.  Yeah.  I mean, I --
19    Q.  You were taking Librium, is that right, when you
20 were admitted to Washington County?  They gave you some
21 Librium, right?
22    A.  Somewhere along the line they probably did.
23    Q.  Yeah.  And that was in an attempt to get you
24 weaned off of your narcotic medications because they have a
25 nonnarcotic --

Page 14

1     A.  Because of what?
2     Q.  The county correctional facility has a policy of
3 no narcotics in the facility; is that right?
4     A.  I never seen no such policy.
5     Q.  Well, you knew.  They told you that, right?  They
6 told you --
7     A.  They tell you a lot of things.
8     Q.  Well, did they tell you that they had a policy
9 that you couldn't have narcotics in the facility?
10    A.  (No response.)
11    Q.  Yes or no?
12    A.  I don't believe they said they had a policy, but
13 they did say --
14    Q.  Right.
15    A.  -- something about narcotics.
16    Q.  Okay.  And what they started giving you was things
17 like Advil and Motrin and things like that for your -- for
18 the neck and back pain, right?
19    A.  Yeah.
20    Q.  All right.  And they also had been telling you
21 that you should be doing some sort of exercise, correct?
22    A.  One nurse mentioned it.
23    Q.  Yeah.  How many times do you think you saw the
24 nursing staff or the medical staff from July 10th of 2002
25 until you were discharged in October of 2002?

Page 15

1     A.  I ain't -- I ain't sure.
2     Q.  You're not sure?
3     A.  That Librium stuff you mentioned, they wasn't
4 giving -- that had to do with no narcotics or wean me off
5 nothing.  They did mention one time that that would -- could
6 help for I believe maybe alcohol or something, but at that
7 point in time I was -- I would have been clean from
8 anything.
9     Q.  Let me see -- let me ask you this:  Let me go
10 through some stuff with you.  You told them when you were
11 admitted that you had attempted suicide.  Is that right?
12    A.  Yeah.
13    Q.  Tried to shoot yourself?
14    A.  Yeah.
15    Q.  Okay.  And then you -- afterwards you told them
16 that you hadn't considered suicide.  Is that right?
17    A.  Yep.
18    Q.  Do you remember on the 11th being seen by one of
19 the medical staff for shoulder pain?
20    A.  (No response.)
21    Q.  Day after you got in?
22    A.  I've seen --
23    Q.  Okay.  I'm just going to ask you if you remember
24 it.  Yes or no.  Does it makes sense you saw them the day
25 after --

Page 16

1     A.  I've seen so many of them here and there, I don't
2 remember exactly what date.  But I have seen some.  I mean,
3 some of them just told me that they don't have physical
4 therapy there.  I mean, I have release papers from the
5 hospital stating I needed physical therapy.  I couldn't
6 move.
7     Q.  I have medical records here that say from between
8 July 10th and October 11th, you were seen 13 times by the
9 medical staff complaining of headaches, sore shoulders,
10 things like that.  Do you remember that?
11    A.  Remember what exactly?
12    Q.  Seeing them 13 times in --
13    A.  I can't -- I don't remember -- I remember seeing
14 them a good bit.  I don't know how many times.  And I put
15 different things on sick call to try to get something that
16 would help my back.  Because they started telling me that
17 they only give -- well, they start charging you for the
18 Motrin or Ibuprofen or whatever they give you.  They start
19 charging -- they tell you, you can only get it once a day.
20 That kind of stuff.  I don't remember exactly when --
21    Q.  Well, let me ask you this question, sir:  You did
22 make requests to see medical staff people, and they came in
23 and evaluated you and saw you.  Is that right?  While you
24 were in the prison.  Correct?
25    A.  Like the nurses and that?

Page 17

1  Q. Yeah, like the nurses and that. Yeah. They saw
2  you when you made requests to see them. Is that right?
3  A. I ain't sure if they seen me every time that I
4  made them, but, yeah, I've seen them.
5  Q. Well, if Cheryl McGavin, who is the nursing
6  supervisor, says that you were seen at least once a day
7  every single day of your incarceration for medication
8  delivery, would you agree with her? Yes or no?
9  A. (No response.)
10 Q. And if you can't remember that, tell me that.
11 A. I don't remember a lot of this. I --
12 Q. My question is to you, if she were to testify that
13 you were seen at least every day for medication delivery and
14 sometimes up to four times a day by the nursing staff, would
15 you disagree with that?
16 A. I wouldn't disagree, but I can't say that I
17 remember being every day. And if it was, it was because
18 they kept -- they weren't giving you nothing that would even
19 help nothing.
20 Q. All right. Do you remember seeing -- being in the
21 clinic with nurses eight times, being seen by the
22 physician's assistant about four times, and by the medical
23 director, the doctor at the facility twice? And during that
24 time they gave you some medication and then told you how to
25 stretch and do range of motion exercises and things like

Page 18

1  that? Do you remember doing all that stuff?
2  A. No one ever -- I don't believe no one ever showed
3  me exactly how to --
4  Q. Did they give you some exercises?
5  A. -- do any kind of stretches, nothing.
6  Q. No? You don't remember them telling you that or
7  showing you how to do them?
8  A. (No response.)
9  Q. Do you remember?
10 A. I'm not sure.
11 Q. Okay. You don't disagree, though. You have
12 nothing in your head that says that it didn't happen.
13 A. I'm ain't so much agreeing with that to --
14 Q. Well, are you not agreeing with the numbers or are
15 you not agreeing with the fact that it took place?
16 A. I'm not -- I'm never -- I'm not sure how many
17 times as the numbers. And as far as them trying to show me
18 stretches, I remember the nurse, Esther, one time told me I
19 needed to stretch. I don't believe -- I mean, they might
20 have showed -- moved my shoulder a couple times or
21 something, but they never showed me exactly how to stretch
22 my back or neck or everything in total.
23 Q. Got you.
24 A. And anytime whenever I would see somebody higher
25 up, as a doctor or the clinic doctor, he would never tell

Page 19

1  me -- he would look at me and check me out, and then he
2  would never tell me what he could do for me until he would
3  go back and talk to one of the nurses or that Cheryl
4  McGavin. And then he would come back all of a sudden and
5  they wouldn't do nothing for me. I don't know why they
6  couldn't have took me to the hospital -- or to physical
7  therapy.
8  Q. Well, but the question, sir, is, did people at the
9  facility see -- did nurses see you every day to give you
10 some medication and that you had seen -- you had a number of
11 visits to the nursing clinic, you visited with the
12 physician's assistant about four times, and you saw the
13 medical director twice. Do you agree with that?
14 A. (No response.)
15 Q. That those things took place while you were
16 incarcerated in Washington County.
17 A. I -- I can agree with seeing -- I can't put a --
18 you know, how many times.
19 Q. Okay.
20 A. But I do agree that I was seen at the facility.
21 Q. They provided you with the ability to see medical
22 personnel. No one stopped you from seeing the medical
23 personnel; is that right?
24 A. I -- there was times whenever they wouldn't let me
25 see a medical -- they would say that there ain't no doctor

Page 20

1  there this day or something --
2  Q. But someone would see you, right? Someone would
3  see you. Correct?
4  A. I mean, sometimes the nurses would see me, but
5  they don't -- I mean, it was the same thing day after day.
6  If they do see you, they don't -- they don't do -- no one
7  ever explained for me how to do any kind of exercises as far
8  as to try to help myself.
9  Q. Okay. So you disagree when your records indicate
10 that they would -- that they told you about stretching and
11 how to do it. Is that what you are telling me; you agree?
12 A. I don't agree that they showed me how to exercise.
13 Q. All right.
14 A. Other than it's possible the one doctor at the
15 time, whenever he was checking my neck and moving my
16 shoulders forward, that he may have showed me how to maybe
17 stretch my arms or something like that.
18 Q. Okay. So he may have said that. So with the
19 understanding that you can't tell me the number of times,
20 you agree that you were seeing folks at that facility for
21 medical treatment and evaluation. You just disagree with
22 the type of treatment they were giving you, right?
23 A. I don't -- I have seen -- I just believe that
24 somebody should have been helping me doing some kind of
25 therapy or --

## Page 21

1  Q. All right. So is that what this is -- what you're
2  saying is you disagree with the course of treatment they
3  were giving you. You wanted some -- you thought they should
4  give you more help in terms of physical therapy. Rather
5  than tell you what to do, they should have showed you what
6  to do. Is that what you're telling me?
7  A. No. I just -- the treatment -- I believe they
8  seen me at some time just because they were supposed to have
9  to see me --
10  Q. Well, what about the times you went to clinic or
11  saw the physician's assistant or the medical director? They
12  didn't have to see you. Every day that you were there,
13  someone brought you some medicine. Is that right?
14  A. I can't say yes or no, but I can say that a lot of
15  times I have taken -- they kept switching to different
16  things.
17  Q. Okay. But you got it. I want to show you
18  something, here. Sir, this is marked A-21. Tell me in
19  terms of the top, just the top part of this, right here
20  (indicating), the first blocks -- this is a grievance form,
21  right? Correct?
22  A. (No response.)
23  Q. Right? Isn't that what that says; Formal Inmate
24  Grievance? Is that what it says?
25  A. Yeah.

## Page 22

1  Q. Okay. And August 21st, 2002. Is that your
2  handwriting on the top?
3  A. Yeah.
4  Q. Did you fill that out? Is that your signature
5  there, Chris Irwin?
6  A. (No response.)
7  Q. Right?
8  A. Yeah.
9  Q. And that's the Corrections Officer's signature?
10  Right?
11  A. Um-hum.
12  Q. Okay. Can you read what it says here that your
13  grievance was.
14  A. Nurse refuses me Motrin, Tylenol. Headache most
15  of the time. I asked for them on 8/21/02 for headache, and
16  I was refused. Rule book states generic something is
17  available during medication pass. This is the ones where
18  they give them to you once a day.
19  Q. Well, what --
20  A. Whenever they --
21  Q. What rule book are you talking about, when you say
22  the rule book states? What rule book are you talking about?
23  A. The CO's got a rule book at the desk.
24  Q. Is it the one that talks about the --
25  A. Sometimes they'll let you see --

## Page 23

1  Q. -- grievance procedures and things like that?
2  That's the same rule book you are talking about?
3  A. There is only one rule book, if they have it or if
4  they let you see it, yes.
5  Q. Well, it's got the grievance procedures. You knew
6  what to fill out there, right? You asked for a formal
7  grievance?
8  A. I don't know if it had -- you would think it would
9  have the procedures in there, but I don't know.
10  Q. Well, you knew about it, because you filled out a
11  grievance form, right? Signed it, said what your grievance
12  was. Correct?
13  A. But I just got a grievance. I'm not so sure -- I
14  mean, I might have seen it in the rule book.
15  Q. I mean, forget about the book. You agree with me
16  that you filled out a grievance form on August 21st, 2002.
17  A. Yeah.
18  Q. Okay. You signed it, right?
19  A. Yeah.
20  Q. Talked about not being given Motrin more than once
21  a day. Is that right? Is that what it was about? For your
22  headaches?
23  A. Somewhere along the line I had problems with teeth
24  too that they wouldn't do nothing with.
25  Q. Okay. Well, I'm just focusing on this one. This

## Page 24

1  was about the headaches, right, and the Motrin and the
2  Tylenol. Correct?
3  A. You have to -- they only want to give you Motrin
4  for headaches once a day. And so if I had problems with my
5  neck and back, other than what they would give me, you had
6  to tell them you have a headache or they won't give it to
7  you.
8  Q. Okay. Do you know what it means when they fill
9  out a form that says "refused sick call"? Do you know what
10  that means?
11  A. No.
12  Q. All right. I'm going to show you another
13  document. It's dated 7/25/02. All right? Have you ever
14  seen that before?
15  A. (No response.)
16  Q. Can you read it?
17  A. Yeah, that's what -- that's what I was telling
18  you. You only get it once a day.
19  Q. Right. But what's it say -- let me just read it
20  for you. Let me see if you can -- it says, "You may order
21  Tylenol and Motrin on commissary to use as needed for
22  discomfort. You may also sign up with CO prior to the
23  morning med. delivery to be given by the nurse in mornings
24  only." All right? That's the part you're talking about.
25  When if you talk to the CO every day, they will come in, in

Page 25
1  the morning and give you one dose.
2      A.  You have to sign the thing the night before.
3      Q.  Right. And you ask for it, and they will come in
4  and give you one dose in the morning. The nurse will.
5  Right. But if you want to buy it, you can buy it as often
6  as you want. Is that right? That's the procedure. And
7  they told you that back in July; that you could buy it if
8  you wanted to. Correct?
9      A.  There is a limit on how many you can buy or
10 something.
11     Q.  Well, but you could buy it, and you would have
12 enough so that you could take it whenever you needed it.
13 Right?
14     A.  No.
15     Q.  Is that right?
16     A.  Not necessarily -- I mean, that's all they going
17 to give you, is Motrin or something in there.
18     Q.  Well, we understand -- I understand --
19     A.  And I got serious neck and back pain.
20     Q.  Right.
21     A.  I'm going to -- I'm going to try to take the
22 Motrin. There ain't nothing helping. They won't do
23 nothing. I'm going to sit in there with my neck and back
24 killing me, how I can't sit down. Hard to lay down.
25     Q.  Did you ever see your discharge from UPMC; what

Page 26
1  that said?
2      A.  I might have had it for a minute, because the
3  sheriffs or whoever take it off me.
4      Q.  Okay. Well, my question is, did you ever see it?
5  Yes or no?
6      A.  I imagine I --
7      Q.  All right.
8      A.  I had it --
9      Q.  Let me show you this, sir: Okay? This is your
10 7/7/02. That's when you were released from UPMC, right?
11 You were in there for five days?
12     A.  No.
13     Q.  When was the accident?
14     A.  July 7th.
15     Q.  So on that day they let you out, right?
16     A.  They didn't leave me out.
17     Q.  They let you out. They discharged you.
18     A.  I was coerced to be taken out of there by a
19 sheriff.
20     Q.  Who is Mary Irwin?
21     A.  My mother.
22     Q.  She signed you out of the hospital, right? That's
23 her signature at the bottom of the page? Very last line.
24 Is that your mother's signature dated 7/7/02? She signed
25 you out of the hospital?

Page 27
1      A.  (No response.)
2      Q.  Do you see where I'm looking at, sir? Do you see
3  your mother's signature at the bottom of the page?
4      A.  Yeah.
5      Q.  Okay. Take a look through there and tell me if
6  there's anything on that discharge instruction that talks
7  about medications.
8      A.  I had a prescription for medications in my hand
9  that they gave me.
10     Q.  Really? Is there anything on there that talks
11 about medications?
12     A.  Says here, "See medication schedule for listing of
13 medications."
14     Q.  And where did you go first? Did you go to
15 Washington -- well, you got out of there on the 7th. Where
16 was the first stop in jail that you went to? Since you
17 didn't get into Washington County until the 10th.
18     A.  Allegheny County.
19     Q.  You went to Allegheny. You were there for three
20 days?
21     A.  No.
22     Q.  Two days?
23     A.  Like a day and a half.
24     Q.  Well, you got out of there on the 7th. You got to
25 Washington on the 10th. Day and a half will put you there

Page 28
1  on the 9th. So you were there the night of the 7th, the
2  8th, the 9th?
3      A.  What --
4      Q.  In Allegheny?
5      A.  No. Something ain't right with these dates.
6  That's what I'm looking at.
7      Q.  What medication -- did you walk out of the
8  hospital with a prescription, or did you walk out of the
9  hospital with medicine?
10     A.  I walked out of the hospital --
11     Q.  With what?
12     A.  The Sheriff must have --
13     Q.  No, that's not what I asked --
14     A.  He had a -- he had a prescription on the paper for
15 medication, and there was a -- he had a paper stating that I
16 needed physical therapy.
17     Q.  How much medication did you get while you were at
18 Allegheny Jail?
19     A.  I ain't sure, but I remember they prescribed --
20 they had me on Vicodin.
21     Q.  They gave you Vicodin -- well, did they give you
22 Vicodin?
23     A.  What is this date?
24     Q.  Did they give you Vicodin at Allegheny?
25     A.  Yeah.

Page 29

1  Q. Okay. How many doses of Vicodin did they give
2  you?
3  A. I don't know. I was still -- I did nothing but
4  sleep the whole time I was there. I was in so much pain and
5  that, that I wasn't even -- like I barely -- I just come out
6  of the bed for like a few minutes the last time I was there,
7  and they told me that I would be leaving. I mean, I was
8  coerced from the Sheriff to leave the hospital because they
9  said they had a warrant for me.
10  Q. Well, did they?
11  A. A warrant that was lifted.
12  Q. What was the warrant for?
13  A. Failure to -- bench warrant supposedly for failure
14  to show up for a hearing.
15  Q. Did you?
16  A. Did I failure to show up [sic]?
17  Q. Yes.
18  A. Yes. And I went the next day.
19  Q. Well, they took you the next day?
20  A. No. No. They did something totally illegal.
21  Them sheriffs did, and so did the police. They faxed my
22  stuff. I already had that bench warrant lifted when they
23  came. Because the day after I missed a hearing or the same
24  day, I called the courthouse, and I went there the next day
25  with a lawyer, and the Judge lifted the bench warrant and

Page 30

1  set another hearing.
2  Q. Well, where did the accident take place?
3  A. Washington County.
4  Q. And somebody died.
5  A. Yes.
6  Q. Were you under the influence of alcohol at the
7  time, or drugs? At the time of the accident.
8  A. I was -- I had a few beers. I was under the limit
9  for DUI.
10  Q. But somebody was dead, and they probably would
11  have had the right to arrest you in the hospital for the
12  death. Is that right? And charge you with vehicular
13  homicide.
14  A. I was already supposed to be under arrest before I
15  ever went there.
16  Q. Well, then maybe you were. So they didn't need
17  the warrant to get you out, did they? They already had you
18  in custody, and as soon as you were able, you were released.
19  A. They didn't.
20  Q. Who did? Who had you in custody?
21  A. Washington County.
22  Q. Yeah, when you were in the hospital under
23  Washington County custody just to be treated, and when they
24  let you out --
25  A. They didn't let me out. I was -- the Sheriff

Page 31

1  come --
2  Q. Who took you --
3  A. -- forced me to leave.
4  Q. The Sheriff of Allegheny County? Allegheny County
5  sheriff?
6  A. Yes.
7  Q. Was it an Allegheny County bench warrant?
8  A. It couldn't have been an Allegheny County -- the
9  hearing was in Washington.
10  Q. Well, why did the Allegheny County Sheriff come
11  and get you? I mean, I'm just curious.
12  A. Supposedly --
13  Q. I'm just curious. It has nothing to do with the
14  lawsuit.
15  A. The Chartiers Township Police Department faxed
16  them that --
17  Q. Which is in Washington County.
18  A. Yeah.
19  Q. So the Chartiers Township Police told the people
20  in Allegheny that there was a warrant for your arrest; bench
21  warrant for failure to get to a hearing. Is that right?
22  A. I'm assuming that.
23  Q. Which police department had placed you under
24  arrest for the accident?
25  A. The same police department.

Page 32

1  Q. Chartiers.
2  A. Yeah. But the -- I went down in the hospital the
3  same day that the Sheriff -- I was off -- that's what I want
4  to ask you. This date, what -- what is that date? They are
5  saying I got released on that date?
6  Q. That's what it says.
7  A. I don't believe that's true. I don't know -- that
8  ain't true.
9  Q. Well, your mom dated it too, sir, 7/7 of '02.
10  That's your mother's writing, that's your mother's
11  signature, and that's your mother's date. 7/7 of '02, it
12  says you were discharged. So you were probably in Allegheny
13  for a couple days. If you slept throughout the whole thing,
14  you may not remember.
15  A. No. There ain't no way that this date is right.
16  Q. Okay. Well --
17  A. Hold on, though. I mean, what -- this accident
18  happened at like 1:30 in the morning.
19  Q. Yeah.
20  A. What date did they put down?
21  Q. And they let you out -- well, the date on there is
22  7/7 of '02, right?
23  A. That's the date the accident happened.
24  Q. Right. And you know what 16:00 hours means in
25  military time?

Ferguson & Holdnack Reporting, Inc.

5e553e1b-52c9-456a-b0a2-8f5131862991

### Page 33

1   A. Yeah.
2   Q. 12 noon would be 12:00 hours.
3   A. That's 4:00.
4   Q. That's 4:00 in the afternoon they let you out.
5   Okay?
6   A. But they couldn't have let me out on that 7/7.
7   Q. Well, that's what it says, sir. So, I mean, maybe
8   everybody -- maybe the --
9   A. The accident happened on 7/7.
10  Q. Well, maybe -- yeah, that would have been -- but
11  if they let you out at 16:00 hours, that meant that the
12  accident happened, what -- if it happened at 1:30 in the
13  morning on the 7th, that would have been 01:30. That was 15
14  hours later. 15 hours later that they let you out of the
15  hospital, according to this.
16  A. So let me think. They are saying they let me out
17  at 7/7 at that time.
18  Q. 4:00 in the afternoon. That's right. That's when
19  your mom signed you out. Anyway, we'll just move on.
20  A. Something ain't right with them dates. I was only
21  in Allegheny County for like a day and a half.
22  Q. Okay. Well, we'll move on. After you filed this
23  grievance on August 21st and it was denied by the deputy
24  warden, did you file an appeal?
25  A. I don't see where it was denied -- denied by the

### Page 34

1   warden.
2   Q. Well, it says "disapproved" right here, doesn't
3   it? See circle? Disapproval? They sent it back to you.
4   You knew that it had been disapproved. Did you file an
5   appeal?
6   A. I knew nothing. I knew nothing on how to file an
7   appeal.
8   Q. Well, you knew enough to file a grievance, right?
9   And somebody would have told you that you have the right --
10  A. Nobody told me.
11  Q. Nobody.
12  A. Nobody told me, or I would have done it.
13  Q. Five days --
14  A. They hide everything from you in that jail.
15  Q. Oh, I see. Everything is hidden from you, except
16  the fact that, as you agreed with me, they let you see --
17  the nurses saw you every day, the medical director saw you
18  twice while you were in there, and the physician's assistant
19  at your request -- and you asked for someone to see you from
20  the mental health department, and they did an evaluation,
21  and you had asked them for a month's worth of nerve
22  medication, right?
23  A. They see you here and there, because they have to
24  see you.
25  Q. No, that wasn't my question -- sir, you agreed

### Page 35

1   with me earlier. I'm not going to argue with you. You
2   agreed with me earlier that when I said to you, do you
3   remember seeing the nurses every day -- you were in the
4   clinic eight times with the nurses, you saw the physician's
5   assistant four times, and the medical director twice, and
6   you were evaluated --
7        (Brief interruption in proceedings.)
8   Q. -- and you were evaluated by Cheryl Young on the
9   16th of July. You told me all that -- you may not remember
10  the numbers of times, but you remember doing that.
11  A. I have seen them. But they won't --
12  Q. Then they didn't refuse to let you see them. And
13  what you did correct is that when you went to see the woman
14  for the mental health evaluation, you asked her for
15  medication for your nerves for at least a month's worth.
16  Isn't that right?
17  A. I -- I ain't sure if that's -- whatever time was
18  when I see her -- one time I had to see her, or they weren't
19  going to let me out of where I was at.
20  Q. Okay. But you asked her for more medicine.
21  A. I needed something for my nerves there. I mean, I
22  didn't --
23  Q. And they gave you stuff. You had Zoloft, you had
24  Elavil, you had all sorts of stuff.
25  A. That stuff don't do nothing.

### Page 36

1   Q. Well, you don't know -- you may believe it doesn't
2   do anything.
3   A. I don't believe. I took it.
4   Q. The question -- the question was, did they give
5   you the medication or not? And the answer to the question,
6   according to you, is, yes, they did, but you didn't believe
7   it worked for you. Is that right?
8   A. They gave me certain medications, and --
9   Q. And you don't think they worked well enough for
10  you, so you wanted something stronger or something
11  different. Is that right?
12  A. For the psychiatrist or for the --
13  Q. Either one. Psychiatrist or for the physical
14  injuries you were claiming.
15  A. For the physical injuries, I think I -- I should
16  have been followed up with some therapy, like it was
17  supposed to be.
18  Q. Right, I know. And you disagree that they gave
19  you -- you don't know what kind of therapy it would have
20  been, right?
21  A. Huh?
22  Q. You had never been in physical therapy until you
23  got here. Is that correct?
24  A. In here, they show you -- they give you --
25  Q. That wasn't my question, sir. Before this

Page 37

1 accident, had you ever been in physical therapy?
2   A.  Before the accident?
3   Q.  Yeah.
4   A.  I went to the chiropractor's.
5   Q.  But not a physical therapist. Is that right? You
6 went to the chiropractor.
7   A.  Yeah.
8   Q.  You were in the hospital for 15 hours, they let
9 you out, they --
10  A.  Oh, yeah, I went -- you said before the accident.
11  Q.  Yeah, before the accident.
12  A.  I didn't see nobody before the accident. In the
13 hospital, yeah, I went to the therapist down there. The
14 same day that they removed me, I went to the therapist. I
15 could barely get out of bed. They wheel me in a wheelchair.
16 I can't move. And they tell her to bring me back in a week.
17 Because I can't move; that I need to rest more. Something
18 like that, she told me.
19  Q.  All right. Let me see if we can sum this up and
20 let you get back --
21  A.  I mean, that County Jail, I mean, I don't know why
22 you keep pushing this issue about these grievances. They
23 deny people grievances. They don't even have them available
24 for you, nothing.
25  Q.  Right. You filled one out, and you didn't appeal

Page 38

1 it after it was disapproved.
2   A.  I knew nothing about an appeal.
3   Q.  Well, you knew about the grievance --
4   A.  I knew nothing about it.
5   Q.  Did you ask anybody, though? Who did you ask when
6 you talked about the rule book? Did you ask the guard, the
7 CO to show you the rule book, and then you filled out the
8 grievance? Did you read the grievance procedure in the rule
9 book?
10  A.  I don't know if I ever seen a grievance procedure
11 in a rule book.
12  Q.  Well, then how did you know that you could even
13 file one?
14  A.  An inmate said a grievance --
15  Q.  Well, then they let you file it, right? The CO
16 came in, you filled it out, took it to the deputy warden,
17 the deputy warden disapproved it, and you didn't do anything
18 after that.
19  A.  I filled it out, was told to put it in that box, I
20 did, and it comes back the next day signed by the nurse --
21  Q.  No, it was the deputy warden, wasn't it?
22  A.  The nurse signed it.
23  Q.  What was the nurse's name?
24  A.  Esther. Is that who signed it?
25  Q.  I don't see Esther on here. It was Cheryl

Page 39

1 McGavin. She's the nursing supervisor.
2   A.  She's a nurse.
3   Q.  When you talked to all the inmates, had any inmate
4 in Washington County that you talked to about these
5 grievances ever filed an appeal?
6   A.  I never heard it mentioned, or I would have knew
7 to file an appeal.
8   Q.  So your testimony is you never read the rule book,
9 although you cited the rule book in the grievance about the
10 medicine --
11  A.  I ain't saying I never read the rule book.
12  Q.  Okay. Well, then --
13  A.  I didn't read the whole thing, necessarily. I
14 have seen rule books.
15  Q.  And my question is, you may not have read the part
16 about the grievance. Is that right?
17  A.  I don't know. I knew -- I had knew nothing about
18 an appeal.
19  Q.  All right. So let's just sort of sum this up
20 here, sir. Okay? You asked to see the nurse, who saw you
21 every day, you saw the physician's assistants a couple
22 times, you were in the clinic eight times, and you saw the
23 medical director, all complaining about various medical
24 conditions, and they evaluated -- and you saw a mental
25 health counselor on the 16th, right? All of those things

Page 40

1 happened while you were in Washington, correct?
2   A.  I seen them various times, yeah.
3   Q.  All right.
4   A.  But --
5   Q.  And your Complaint against the prison is that they
6 didn't do what you wanted them to do, which is to give you
7 different kinds of medicine. Is that right? Is that your
8 complaint?
9   A.  My complaint is that my neck and my back was
10 messed up. I had release papers stating physical therapy
11 and that. And I knew -- no idea about how to begin to do
12 physical therapy, and they would not even give me any kind
13 of papers or show me other than maybe one time the guy might
14 have showed me how to move my arms around and that. I was
15 in so much pain, how am I going to do therapy taking the
16 Motrin?
17  Q.  Okay, sir. So here --
18  A.  I was in bad pain.
19  Q.  Okay. So you're in -- so according to you, you
20 were in bad pain, they saw you -- you asked to be seen, they
21 saw you. You disagree with what treatment plan they thought
22 you should have. Is that right? You didn't agree with what
23 they were saying, but it wasn't because they didn't see you.
24 It was because you just didn't agree with what they were
25 going to do. Is that right?

Page 41

1  A.  No. I kept seeing them, hoping that maybe one of
2  them is going to do what they were supposed to, which is
3  therapy.
4  Q.  Which is what? Which is give you a narcotic
5  medication?
6  A.  No. No, it didn't have to be narcotics.
7  Something that would work.
8  Q.  Well, what do you think would be a nonsteroidal,
9  nonnarcotic medication that you take now that works?
10 A.  There's one out there now I heard that starts with
11 an A. I had no idea then.
12 Q.  You told us they were giving you Aleve, right?
13 A.  What?
14 Q.  They gave you Aleve?
15 A.  I believe that's what it was. They kept giving me
16 different things.
17 Q.  Okay. Well, let me just -- let's just go through
18 here for a minute.
19 A.  I mean, I couldn't understand why they couldn't
20 send me to therapy.
21 Q.  Do you know what you bought at the commissary on
22 July 16th?
23 A.  I don't see where my commissary has to do with
24 anything.
25 Q.  Well, besides the shampoo and the nacho chips and

Page 42

1  the candy and the Kool-Aid, you bought a two-pack of Advil
2  which had -- you bought two packages of Advil with three in
3  each. Okay?
4      On the 22nd, besides all the other stuff you
5  bought, the foot powder and the cookies and the candy, you
6  bought another pack of Extra-Strength Tylenol.
7      Then in August, August 5th, besides all the junk
8  food and stuff and the stamps and whatever, you bought five
9  packages -- three packs of Tylenol extra-strength and a two
10 pack of Advil.
11     On the 13th, besides everything else you bought,
12 you bought a two -- two packages of Extra-Strength Tylenol.
13     And on the 10th of September, you bought three
14 packs of Extra-Strength Tylenol.
15     And on the 30th you bought three packs of
16 Extra-Strength Tylenol.
17     You had -- you could buy as much Advil, Motrin, or
18 Tylenol over the counter in that prison commissary as you
19 wanted to buy; is that right?
20 A.  No, it's not right.
21 Q.  Well, how many packages could you buy?
22 A.  There's a limit. I don't know.
23 Q.  How many?
24 A.  There's a limit.
25 Q.  You could have gone there every day, right?

Page 43

1  A.  Huh?
2  Q.  You could have bought it every day, if you wanted
3  more, correct?
4  A.  (No response.)
5  Q.  Yes or no?
6  A.  The nurses deliver it. It was supposed to be in
7  the mornings.
8  Q.  So you've got a morning delivery, and then you had
9  the stuff that you could have taken afterwards. Right?
10 A.  Off and on. But the -- look, my neck and my back
11 is in so much pain. They ain't showing no physical therapy.
12 What is Tylenol or any of that stuff going to do?
13 Q.  So the difference --
14 A.  I couldn't move my neck. If I was standing up, I
15 would have to turn your direction very slowly to see you, I
16 was in so much pain.
17 Q.  Any broken bones?
18 A.  They said there wasn't. There was muscle pains or
19 something.
20 Q.  You had sore muscles. You had a soft tissue
21 injury after the accident?
22 A.  I don't know what --
23 Q.  But as you sit here today -- I don't want to
24 misunderstand what you told me, and I don't want the Judge
25 to misunderstand. Every time you asked to see somebody from

Page 44

1  the medical staff, you were allowed to do that. Is that
2  right?
3  A.  I can't say that every time I was. I seen them a
4  lot, but I can't say every time. They -- they try to deny
5  what they can and get away with there.
6      MR JOYAL:  I don't have any other questions of
7      you, sir. Would you like to read and -- this
8      transcript, or do you want to take what Janis, you
9      know -- trust Janis that she put every word down?
10     I mean, she'll be happy to send a copy to you.
11     You're just going to have to turn around and make
12     sure you send it back to her.
13     (Discussion held off the record.)
14
15     (Deposition concluded at 11:46 a.m., and signature
16     of the deponent was not waived.)

Ferguson & Holdnack Reporting, Inc.

5e553e1b-52c9-456a-b0a2-8f5131862991